**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**HUNTINGTON DIVISION**

**WILLIAM L. MUNDY,**

**Plaintiff,** **Civil Action No. 3:26-cv-00712**

**v.**

**STEPHEN M. "SAM" HOOD,**

**Defendant.**

# COMPLAINT

Now comes the Plaintiff, William L. Mundy ("Mundy"), by counsel, Arden J. Curry, II, and for his Complaint against Defendant Stephen M. "Sam" Hood ("Hood"), alleges as follows.

## PARTIES

1. Plaintiff William L. Mundy is a citizen of the State of West Virginia and is domiciled in Cabell County, West Virginia.

2. Mundy is an attorney engaged in the practice of law in Huntington, Cabell County, West Virginia.

3. Mundy's professional reputation for honesty, integrity, competence, and ethical conduct is essential to his profession, livelihood, and standing before clients, attorneys, courts, judges, and the community.

4. Defendant Stephen M. "Sam" Hood is a citizen of the State of South Carolina and is domiciled in Horry County, South Carolina.

5. Hood has himself alleged in a presently pending federal action that he is a citizen and resident of Horry County, South Carolina.

## SUBJECT-MATTER JURISDICTION

6. This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

7. Section 1332(a)(1) grants federal district courts original jurisdiction over civil actions in which the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and the action is between citizens of different States.

8. Mundy is a citizen of West Virginia.

9. Hood is a citizen of South Carolina.

10. Complete diversity of citizenship therefore exists between Plaintiff and Defendant.

11. Mundy seeks compensatory, reputational, professional, consequential, and punitive damages in an amount exceeding $75,000.00, exclusive of interest and costs.

12. The amount-in-controversy requirement of § 1332(a) is therefore satisfied.

13. This Court accordingly possesses original subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

## PERSONAL JURISDICTION

14. This Court has specific personal jurisdiction over Hood because Hood purposefully established substantial and continuing contacts with West Virginia, and the claims asserted herein arise out of or relate directly to those contacts.

15. Hood affirmatively invoked the jurisdiction of West Virginia courts by instituting and prosecuting litigation concerning the Estate of his mother, Dorothy Hood.

16. In 2013, Hood instituted *Hood v. Hood*, Civil Action No. 13-C-782 in the Circuit Court of Cabell County, West Virginia, challenging the validity of Dorothy Hood's Last Will and Testament and asserting claims relating to the administration and disposition of the Estate.

17. On August 3, 2015, Hood, through counsel, instituted Civil Action No. 15-C-546 in the Circuit Court of Cabell County, West Virginia.

18. Hood asserted claims in that action including lack of testamentary intent and capacity; fraud, duress, mistake and/or undue influence; tortious interference; breach of fiduciary duty; civil conspiracy; and vicarious liability.

19. Mundy represented interests adverse to Hood in Civil Action No. 15-C-546.

20. Hood voluntarily prosecuted that West Virginia litigation for years and repeatedly sought affirmative relief through the West Virginia judicial system.

21. Hood's purposeful contacts with West Virginia continue to the present.

22. Hood is presently the plaintiff in *Stephen Hood v. Mike J. Kelly, Mark W. Kelley and Ray, Winton & Kelley, PLLC,* Civil Action No. 2:25-cv-00709, pending in the United States District Court for the Southern District of West Virginia.

23. On December 2, 2025, Hood filed an Amended Complaint in that action affirmatively invoking this Court's diversity jurisdiction under 28 U.S.C. § 1332.

24. Hood's presently pending federal action arises from and is directly related to the underlying West Virginia litigation giving rise to the present controversy.

25. Hood alleges in that action that his former attorneys represented him in Civil Action No. 15-C-546 until April 15, 2024.

26. Hood further alleges that after retaining new counsel in April 2024, “the case was resolved within five months.”

27. The underlying litigation was resolved through the September 16, 2024 mediation and settlement described below.

28. Hood has therefore repeatedly and affirmatively invoked both the state and federal judicial systems located in West Virginia to obtain affirmative relief concerning the underlying controversy.

29. The defamatory accusations giving rise to this action arose directly from that West Virginia litigation, its settlement, and Mundy's professional activities as a West Virginia attorney.

30. Following the settlement, Hood repeatedly directed communications into West Virginia and made communications to third persons concerning Mundy and Mundy's conduct as a West Virginia attorney.

31. Hood knew Mundy was domiciled in West Virginia, practiced law in West Virginia, and maintained his professional reputation and livelihood principally in West Virginia.

32. Hood further knew and intended that accusations attacking Mundy's honesty, integrity, ethics, and fitness as an attorney would cause professional and reputational injury to Mundy in West Virginia.

33. Hood's contacts with West Virginia are neither random, fortuitous, isolated, nor attenuated.

34. Mundy's claims arise directly from or relate to Hood's purposeful contacts with West Virginia.

35. Exercise of specific personal jurisdiction over Hood therefore comports with applicable federal law and constitutional due process.

## VENUE

36. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Mundy's claims occurred within this District.

37. The underlying litigation was prosecuted in Cabell County; Mundy's professional activities at issue occurred in West Virginia; the settlement resolved West Virginia litigation; Hood directed communications concerning Mundy into West Virginia; and substantial professional and reputational injury caused by Hood's conduct occurred in West Virginia.

38. Cabell County lies within the Huntington Division of this Court.

39. Venue is therefore proper in the Huntington Division.

## GENERAL FACTUAL ALLEGATIONS

### The Underlying Litigation

40. In *Hood v. Hood*, Civil Action No. 13-C-782, Hood instituted an action against his brother, Jeff Hood, who was the Administrator of the estate of Dorothy Hood, and Paul Farrell, and his law firm Farrell, Farrell, and Farrell, and involved claims asserted by Hood relating to the Estate.

41. Mundy represented parties and interests adverse to Hood.

42. The conduct by Mundy about which Hood subsequently complained occurred in Mundy's professional capacity as a West Virginia attorney.

43. In April 2024, Hood retained new counsel.

44. As Hood himself subsequently alleged in this Court, the underlying litigation "was resolved within five months."

### The September 16, 2024 Settlement

45. On September 16, 2024, the parties participated in mediation concerning Civil Action No. 15-C-546.

46. The mediation resulted in a settlement.

47. Hood agreed to execute a full release and dismiss Civil Action No. 15-C-546 with prejudice.

48. The parties subsequently entered into a written Confidential Release and Settlement Agreement implementing the settlement.

49. Hood therefore knew from his voluntary personal participation, agreement, and execution of the settlement documents that the September 16 mediation resulted in a negotiated settlement.

50. Nevertheless, Hood subsequently embarked upon a continuing course of accusing Mundy of fraud, attempted fraud, dishonesty, unethical conduct, abuse of the judicial system, and other serious professional misconduct arising from the settlement and underlying litigation.

51. Hood's central accusation—that Mundy attempted to defraud Hood of $925,000.00 through the settlement—was false.

52. Mundy did not attempt to defraud Hood of $925,000.00 or any other sum.

53. Mundy did not engage in fraud, deceit, dishonesty, corruption, or unethical conduct in negotiating or implementing the settlement.

## HOOD'S DEFAMATORY PUBLICATIONS

**March 14, 2025 Publication**

54. On March 14, 2025, Hood transmitted a written communication concerning Mundy to Mundy and third persons, including attorneys Ryan Ashworth and Steve Nord.

55. Hood characterized the September 16 settlement as a “failed attempted fraud.”

56. Hood further accused Mundy of “relentless harassment” and “repeated threats.”

57. The communication was published to persons other than Mundy.

58. In context, Hood's accusation of attempted fraud was reasonably understood as an assertion that Mundy, while acting as an attorney, participated in fraudulent conduct concerning the settlement.

59. The accusation was false.

**Hood’s Ethics Complaint and Unanimous Affirmance of Its Closing**

60. On April 21, 2025, Hood filed an ethics complaint against Mundy with the West Virginia Office of Lawyer Disciplinary Counsel (“ODC”) concerning Mundy’s professional conduct in litigation relating to the Estate of Dorothy Hood.

61. Hood’s disciplinary complaint alleged professional misconduct by Mundy arising from the litigation in which Mundy represented interests adverse to Hood.

62. On April 29, 2025, ODC closed Hood’s disciplinary complaint without imposing disciplinary action against Mundy.

63. On May 3, 2025, Hood sought review of the decision to close his disciplinary complaint.

64. Hood’s challenge to the closing decision was considered by the Full Investigative Panel of the West Virginia Lawyer Disciplinary Board.

65. On May 31, 2025, the Full Investigative Panel unanimously affirmed the closing of Hood’s complaint by a vote of 6–0.

66. On June 2, 2025, ODC notified Hood that the Full Investigative Panel had affirmed the decision to close the complaint and that the disciplinary matter was concluded.

67. Accordingly, before his subsequent November 18, 2025 letter to Judge Andrew Ballard and other judges, Hood had been informed that his disciplinary complaint was closed and that the closing decision had been affirmed unanimously, 6–0, upon his request for review.

68. Following the disciplinary disposition, Hood continued to accuse Mundy of unethical conduct and dishonesty.

69. On June 2, 2025, Hood directed correspondence to Chief Lawyer Disciplinary Counsel Rachael Fletcher Cipoletti, with copies to Mundy and the West Virginia State Bar Board of Governors, criticizing Mundy's professional character.

70. In that correspondence, Hood described Mundy as "the most unethical and abusive attorney I've personally encountered" and a "stain on the legal profession."

71. Hood subsequently repeated accusations attacking Mundy's professional honesty and integrity in extrajudicial communications, including his November 18, 2025 letter addressed to Judge Ballard and copied to other members of the judiciary.

72. The closing of Hood's disciplinary complaint and the Full Investigative Panel's unanimous affirmance are relevant to the chronology of Hood's knowledge and his state of mind when he later published accusations against Mundy.

73. The disposition of the disciplinary complaint is not alleged to be a conclusive adjudication of the falsity of every accusation Hood made; rather, it is among the circumstances relevant to whether his subsequent extrajudicial publications were made with knowledge of falsity or reckless disregard for the truth.

74. Mundy does not seek to impose defamation liability for statements made in the disciplinary proceeding to the extent those statements are protected by an applicable privilege.

75. Mundy relies upon the disciplinary proceedings and their disposition as background evidence bearing on Hood's later publications, knowledge, intent, and state of mind.

**November 18, 2025 Publication to Judge Andrew Ballard and Other Judges**

76. On November 18, 2025, Hood authored and transmitted a three-page letter addressed to the Honorable Andrew Ballard of the Lawrence County Court in Ironton, Ohio. (See letter attached here to as Exhibit B.)

77. Hood placed the subject "Attorney Bill Mundy" prominently upon the letter.

78. Hood began the letter by expressly stating that it concerned "the conduct and character of Huntington attorney Bill Mundy."

79. Hood did not limit the publication to Judge Ballard or Mundy.

80. Hood's distribution list reflects that he copied and distributed the letter to numerous other members of the judiciary identified by Hood as Judges James Young, Wayne County, Sean Hammers, Cabell County, Greg Howard, Cabell County, Chad Lovejoy, Cabell County, Jason Fry, Wayne County, Craig Tatterson, Mason County, Cromley, Ashley, Witt, Phillip Stowers, Putnam County, Mark Sorsaia, Putnam County and Kristen Finley, Lawrence County.

81. Hood therefore deliberately disseminated his accusations concerning Mundy to Judge Ballard and at least twelve additional judges.

82. Hood expressly disclosed his purpose in making this publication, stating: "The purpose of this letter is to alert judges to Mr. Mundy's dishonesty and abusiveness."

83. Hood's own statement demonstrates that the letter was specifically intended to affect Mundy's reputation and professional standing among members of the judiciary.

84. Hood accused Mundy of "dishonesty," "unprofessionalism," and "brazen abuse of legal processes."

85. Hood further accused Mundy of abusing witnesses, fellow attorneys, and judges.

86. Hood called Mundy “a stain on the legal profession” and asserted that Mundy disgraced the West Virginia legal system.

87. Hood did not confine his publication to insults, rhetorical hyperbole, or expressions of subjective opinion.

88. Instead, Hood asserted specific purported facts accusing Mundy of fraudulent, dishonest, unethical, and potentially criminal conduct.

89. With respect to the September 2024 settlement, Hood represented to Judge Ballard and the other judicial recipients that Mundy had “revealed a sinister scam he had secretly concocted.”

90. Hood represented that Mundy instructed an allegedly “vulnerable 81-year-old widowed client” not to pay Hood the settlement.

91. Hood further represented that Mundy demanded that Hood institute another lawsuit to recover the settlement.

92. Hood represented that when Hood sought enforcement of the settlement, Mundy threatened to sue Hood for disparagement.

93. Hood then escalated his accusations from alleged professional misconduct to accusations suggesting potentially criminal conduct.

94. Hood represented to Judge Ballard and the other judges that Hood's attorneys had petitioned Judge Hoke for grand-jury access to investigate “possible criminal fraud charges” against Mundy.

95. Hood represented that he personally contacted the Federal Bureau of Investigation in Conway, South Carolina regarding what Hood characterized as Mundy's “fraud attempt.”

96. Hood further represented that he had been assigned an FBI agent identification number concerning the matter.

97. Hood represented that Mundy had “recklessly drawn” Merrill Lynch into the purported scheme.

98. Hood further asserted that Mundy's conduct caused Merrill Lynch to violate Securities and Exchange Commission anti-fraud regulations.

99. Hood asserted that immediately after Hood contacted the FBI and Merrill Lynch, Mundy “quickly instructed his client” to release Hood's settlement funds.

100. In context, Hood thereby conveyed that Mundy altered his conduct after Hood exposed fraudulent or potentially criminal activity.

101. Hood further represented that the confidentiality provisions of the settlement had been obtained from him by Mundy “through false representations.”

102. Hood accused Mundy of knowingly inflicting years of unnecessary litigation despite allegedly learning facts early in discovery demonstrating the supposed lack of merit of the underlying dispute.

103. Hood also made a specific factual accusation concerning Mundy's honesty in official proceedings.

104. Hood represented that Mundy had told Judge Hoke at a February 13, 2017 hearing that Mundy was not being paid for his work in the Dorothy Hood estate litigation but later submitted an affidavit to the West Virginia Ethics Commission “swearing that he was being paid.”

105. In context, Hood intended that statement to convey to the judicial recipients that Mundy had made materially inconsistent statements in official proceedings and had been dishonest concerning his compensation.

106. Hood further represented that Mundy had “successfully manipulated” West Virginia courtrooms for eleven years.

107. Hood characterized Mundy's conduct as “gamesmanship and shameless egregious abuse of the justice system.”

108. Hood asserted that Mundy was “devoid of honor and integrity.”

109. Hood accused Mundy of “relentless, obsessive lawfare.”

110. Hood advised the judicial recipients that he intended to publish a book concerning his experience that would expose what Hood characterized as West Virginia legal scandals and Mundy's conduct.

111. Hood concluded the letter by expressly inviting Mundy to sue him if Mundy believed the letter to be false or defamatory.

112. Hood announced that, if sued, he would personally fund his defense, control discovery, refuse settlement, and take the case to a jury.

113. The November 18 publication was neither inadvertent nor incidental.

114. Hood affirmatively selected members of the judiciary as recipients of accusations attacking the honesty, integrity, ethics, professional fitness, and alleged criminal conduct of a practicing attorney.

115. Hood expressly admitted that his purpose was to “alert judges” to Mundy's supposed dishonesty.

116. Hood knew Mundy regularly practices law before courts and that Mundy's professional livelihood depends materially upon his reputation for honesty and integrity among judges and other members of the legal profession.

117. Hood therefore knew and intended that communicating accusations of fraud, dishonesty, manipulation of courts, unethical conduct, and potentially criminal conduct to judges was likely to injure Mundy in the practice of law.

118. Hood's factual accusations concerning the September 2024 settlement were false.

119. Hood personally participated in the September 16 mediation, agreed to the settlement, and executed the written Memorandum of Understanding memorializing its terms.

Hood was represented by competent council at the mediation.

120. Hood thereafter entered into the written agreement implementing the settlement.

121. Fourteen days after the Ballard publication, Hood filed his December 2, 2025 Amended Complaint in his case involving his prior attorneys alleging that after retaining new counsel in April 2024, the underlying case “was resolved within five months.”

122. Hood thus acknowledged in a federal pleading that the underlying litigation had been resolved while simultaneously representing to judges and other third persons that the negotiated settlement constituted a “sinister scam” and “fraud attempt.”

123. Hood made the November 18 publication knowingly, intentionally, maliciously, and/or with reckless disregard for the truth or falsity of the factual accusations contained therein.

**December 1, 2025 Publication to Merrill Lynch**

124. Hood's campaign did not end with his November 18 publication to members of the judiciary.

125. On December 1, 2025, Hood transmitted another written communication concerning Mundy and copied a representative associated with Merrill Lynch Wealth Management.

126. Hood thereby published the communication to a third person.

127. Hood asserted that Mundy had taken advantage of another person's trust and confidence in Mundy's legal instructions “to attempt to defraud me of $925,000.”

128. Hood further characterized Mundy as an unethical and abusive person who had “repeatedly weaponized the legal system against me.”

129. The accusation that Mundy attempted to defraud Hood of $925,000.00 was an assertion of objectively verifiable fact.

130. That factual accusation was false.

131. Hood's accusation expressly concerned Mundy's conduct as an attorney and directly attacked Mundy's honesty, ethics, integrity, and professional fitness.

**December 2, 2025 Federal Pleading**

132. On December 2, 2025, Hood filed an Amended Complaint in Hood v. Kelly, et al., Civil Action No. 2:25-cv-00709, pending in this Court.

133. Hood alleged in that pleading that after retaining new counsel in April 2024, "the case was resolved within five months."

134. Mundy does not assert Hood's statements in that judicial pleading as independently actionable defamatory publications.

135. Hood's pleading is relevant to Hood's knowledge of the underlying facts, state of mind, and the falsity and malice associated with his independent extrajudicial publications.

**December 5, 2025 Continuing Conduct**

136. On December 5, 2025, Hood represented that complaints against Merrill Lynch to the SEC, FINRA, and the West Virginia Auditor's Office were ready for submission.

137. Hood stated that he had prepared a written recitation of events for use in those complaints.

138. Hood further accused Mundy of being obsessed with harassing and abusing him and described Mundy as unscrupulous and reckless.

139. Hood stated his intention to notify a Merrill Lynch representative concerning the proposed complaint.

140. Mundy does not presently allege, without further documentary confirmation or discovery, that every proposed regulatory complaint was actually filed.

141. These communications are relevant to Hood's continuing course of conduct, intent to disseminate his accusations, knowledge, and malice.

**June 27, 2026 Continuing Accusations**

142. On June 27, 2026, Hood again accused Mundy of a "reckless attempt to defraud me of $925,000" before, on, and after September 16, 2024.

143. Hood further referred to Mundy and others as "corrupt lawyers and judges" and threatened additional litigation.

144. To the extent that the presently available June 27 communication was directed solely to Mundy, Mundy does not rely upon that communication standing alone to establish third-party publication.

145. The communication is relevant to Hood's continuing adherence to his accusations, intent, knowledge, state of mind, and actual malice concerning his publications to third persons.

## FALSITY, KNOWLEDGE, AND ACTUAL MALICE

146. Hood's central factual accusation—that Mundy attempted to defraud Hood of $925,000.00 through the September 16, 2024 settlement—is false.

147. Hood had firsthand knowledge of facts demonstrating the falsity of that accusation.

148. Hood personally participated in the mediation.

149. Hood was represented by counsel.

150. Hood agreed to the settlement.

151. Hood personally executed the Memorandum of Understanding memorializing the settlement.

152. The settlement provided for Hood to receive significant compensation.

153. Hood thereafter entered into the written settlement agreement implementing the resolution.

154. Hood's December 2, 2025 federal pleading further alleges that the underlying case was "resolved within five months" after Hood retained new counsel in April 2024.

155. Hood nevertheless repeatedly published accusations that Mundy attempted to defraud him through that resolution.

156. Hood's accusations of a secret scam, attempted fraud, possible criminal fraud, and dishonest professional conduct were not merely rhetorical disagreement with Mundy's litigation positions.

157. An accusation that a practicing attorney attempted to defraud another person of $925,000.00 conveys an objectively verifiable assertion of intentional dishonesty and fraudulent conduct.

158. Hood reinforced those factual accusations by alleging that Mundy's conduct warranted potential criminal investigation and by representing to judges that Hood had reported Mundy's alleged fraud to the FBI.

159. Hood further reinforced his attack upon Mundy's professional honesty by alleging that Mundy made materially inconsistent representations in official proceedings concerning his compensation.

160. Hood knew the challenged factual statements were false or acted with reckless disregard for whether they were true or false.

161. Hood's repetition of the accusations over an extended period despite his firsthand knowledge of the underlying events demonstrates actual malice.

162. Hood's deliberate selection of members of the judiciary as recipients of his November 18 letter, together with his express statement that his purpose was to alert judges to Mundy's supposed dishonesty, further demonstrates his intent to damage Mundy's professional reputation.

163. Hood's express invitation that Mundy sue him for defamation further demonstrates that Hood appreciated the defamatory nature and potential consequences of his publication and deliberately proceeded with it.

**PROFESSIONAL AND REPUTATIONAL INJURY**

164. Hood's publications expressly identified Mundy by name.

165. Hood knew Mundy was a practicing West Virginia attorney.

166. Hood's publications directly concerned Mundy's honesty, integrity, ethics, professional conduct, use of his law license, conduct before courts, and fitness to practice law.

167. Accusing an attorney of attempting to defraud another person of $925,000.00 directly prejudices that attorney in his profession.

168. Accusing an attorney of dishonest statements in official proceedings, manipulation of judges and courts, fraudulent conduct, and conduct potentially warranting criminal investigation likewise attacks qualities essential to the practice of law.

169. The November 18 publication was particularly injurious because Hood deliberately disseminated the accusations to members of the judiciary—the very persons before whom Mundy practices his profession.

170. Hood expressly intended the judicial recipients to alter their view of Mundy's honesty and professional character.

171. Hood's publications exposed Mundy to distrust, contempt, ridicule, reputational injury, and impairment of his professional standing.

172. As a direct and proximate result of Hood's publications, Mundy has suffered injury to his professional reputation, personal reputation, standing in the community, and professional and business interests.

173. Mundy has further suffered humiliation, embarrassment, annoyance, inconvenience, mental anguish, and emotional distress.

174. Mundy has sustained damages in an amount to be determined by the jury.

**COUNT I**

**DEFAMATION — LIBEL**

175. Mundy incorporates Paragraphs 1 through 174 as though fully set forth herein.

176. Hood made false and defamatory statements concerning Mundy.

177. Hood published those statements to third persons, including attorneys, a financial-services professional, Judge Andrew Ballard, and numerous additional members of the judiciary.

178. Hood falsely represented, expressly or by reasonable implication, that Mundy: (a) attempted to defraud Hood of $925,000.00; (b) secretly concocted a fraudulent settlement scheme; (c) engaged in conduct potentially constituting criminal fraud; (d) manipulated judges and courts; (e) made dishonest or materially inconsistent representations in official proceedings; (f) engaged in dishonest and unethical professional conduct; (g) misused or abused his law license and the judicial process; and (h) engaged in conduct incompatible with the honesty and integrity required of an attorney.

179. The foregoing factual assertions were false.

180. Hood knew the statements were false or published them with reckless disregard for their truth or falsity.

181. Alternatively, Hood was at least negligent in failing to ascertain the truth before publishing the statements.

182. Hood's publications were defamatory because they tended to lower Mundy in the estimation of others, deter persons from associating or dealing with him, and prejudice Mundy in his profession.

183. Hood's publications were intentional and repeated.

184. Hood's November 18 publication was specifically directed toward influencing members of the judiciary against Mundy in matters directly implicating Mundy's honesty, integrity, and professional fitness.

185. To the extent Hood asserts a qualified privilege concerning any publication, Hood abused and forfeited any such privilege by knowingly or recklessly publishing false factual accusations, acting with actual malice and improper purpose, and/or disseminating the accusations beyond persons reasonably necessary to accomplish any legitimate privileged purpose.

186. Mundy does not base this action upon any communication determined by the Court to be absolutely privileged under applicable law.

187. As a direct and proximate result of Hood's defamatory publications, Mundy has suffered compensable damages.

**COUNT II**

**DEFAMATION PER SE - IMPUTATIONS OF CRIMINAL CONDUCT AND CONDUCT PREJUDICIAL TO PLAINTIFF IN HIS PROFESSION**

188. Mundy incorporates Paragraphs 1 through 187 as though fully set forth herein.

189. Mundy is a licensed attorney whose profession necessarily depends upon honesty, integrity, ethical conduct, competence, and the trust of clients, courts, judges, attorneys, and the public.

190. Hood's publications directly concerned Mundy's conduct and fitness in the practice of law.

191. Hood accused Mundy of attempting to defraud another person of $925,000.00 while acting as an attorney.

192. Hood accused Mundy of dishonest, fraudulent, unethical, abusive, and unscrupulous professional conduct.

193. Hood accused Mundy of manipulating courts and judges and abusing the legal process.

194. Hood communicated accusations suggesting that Mundy's conduct potentially warranted criminal investigation.

195. Hood published these accusations directly to numerous judges for the expressly stated purpose of alerting them to Mundy's alleged dishonesty.

196. These accusations directly prejudice Mundy in his profession and impute conduct incompatible with the proper practice of law.

197. Under West Virginia law, defamation per se includes imputations of a crime of moral turpitude and imputations affecting a person's business, trade, profession, or office. *Mauck v. City of Martinsburg,* 167 W. Va. 332, 336 n.3, 280 S.E.2d 216, 219 n.3 (1981).

198. Hood's accusations that Mundy, while acting in his professional capacity as an attorney, attempted to commit fraud, engaged in dishonest and unethical conduct, manipulated courts and judges, abused his law license and the judicial process, and engaged in conduct

potentially warranting criminal investigation directly impute criminal conduct, dishonesty, unethical conduct, and professional unfitness to Mundy in the practice of law.

199. Hood's publications therefore constitute defamation per se because they impute potentially criminal fraudulent conduct and directly prejudice Mundy in his profession by imputing conduct incompatible with the honesty, integrity, ethical character, and professional fitness required of an attorney.

200. Under West Virginia law, where defamatory words are actionable per se, a plaintiff is not required to plead or prove special pecuniary damages as a prerequisite to recovery of general damages, because the law permits recovery of damages that are the natural and probable consequence of the defamatory words. *Milan v. Long*, 78 W. Va. 102, 88 S.E. 618, Syl. Pt. 2 (1916).

201. Mundy is therefore entitled to recover general and presumed damages naturally and probably resulting from Hood's defamatory publications, to the extent permitted by West Virginia law, without being required to establish a specific lost client, lost legal fee, lost case referral, or other particular pecuniary loss as a prerequisite to such recovery, together with any additional special, consequential, and punitive damages established by the evidence and permitted by law.

**ACTUAL MALICE AND PUNITIVE DAMAGES**

202. Mundy incorporates Paragraphs 1 through 201 as though fully set forth herein.

203. Hood's conduct was intentional, malicious, willful, wanton, and undertaken with knowledge of falsity and/or reckless disregard for the truth.

204. Hood knew the circumstances of the September 16 settlement firsthand.

205. Hood personally agreed to and executed the settlement documents.

206. Hood nevertheless repeatedly accused Mundy of fraudulent and potentially criminal conduct arising from that settlement.

207. Hood escalated his campaign by deliberately publishing those accusations to numerous members of the judiciary.

208. Hood expressly stated that his purpose was to alert judges to Mundy's alleged dishonesty.

209. Hood therefore intended his publication to cause injury in the very professional arena in which Mundy earns his livelihood and depends upon a reputation for honesty and integrity.

210. Hood's repeated dissemination of the accusations demonstrates that his conduct was neither accidental nor inadvertent.

211. Hood expressly anticipated a defamation action and invited Mundy to sue him, stating that he would personally fund his defense and take the case to a jury.

212. Hood's conduct demonstrates actual malice and a conscious, reckless, and outrageous indifference to Mundy's rights and professional reputation.

213. Mundy is entitled to punitive damages sufficient to punish Hood and deter similar conduct, subject to applicable West Virginia law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff William L. Mundy respectfully demands judgment against Defendant Stephen M. "Sam" Hood and requests:

1. Compensatory damages for injury to Mundy's professional and personal reputation;
2. General and presumed damages naturally and probably resulting from Hood's defamatory publications, to the extent permitted by West Virginia law, without proof of special

pecuniary loss as a prerequisite to recovery, because Hood's statements constitute defamation per se under West Virginia law;

3. Damages for humiliation, embarrassment, annoyance, inconvenience, mental anguish, and emotional distress;
4. Special and consequential damages established through discovery and at trial;
5. Damages for injury to Mundy's professional practice and business interests;
6. Punitive damages in an amount sufficient to punish Hood and deter similar conduct;
7. Prejudgment and post-judgment interest as permitted by law;

   Taxable costs; and

8. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff William L. Mundy demands trial by jury on all issues so triable.

**WILLIAM L. MUNDY**

**By Counsel**

**ARDEN J. CURRY, II, ESQUIRE**
WV State Bar No. 907
Pauley Curry, PLLC
100 Kanawha Blvd. West
Charleston, West Virginia 25302
Telephone: 304-342-6000
Email: 304-342-6007
**Counsel for Plaintiff William L. Mundy**